# 99 DTA 146

**TRIBUNAL DE CIRCUITO DE APELACIONES
CIRCUITO REGIONAL I DE SAN JUAN
PANEL IV**

PONCE FEDERAL BANK, F.S.B.
Peticionario

v.

CHUBB LIFE INSURANCE COMPANY OF AMERICA; RAMIRO L. COLON, JR., GEORGINA ORTIZ DEXTER Y LA SOCIEDAD LEGAL DE GANANCIALES ENTRE ELLOS CONSTITUIDA; JOHN DOE Y JANE DOE
Recurridos-Apelados

Núm. KLAN-97-01246

San Juan, Puerto Rico, a 7 de mayo de 1999

Panel integrado por su Presidenta, la Juez López Vilanova,
el Juez Cordero y la Juez Feliciano Acevedo

Feliciano Acevedo, Juez Ponente

### TEXTO COMPLETO DE LA SENTENCIA

Acude ante nos el Ponce Federal Bank, F.S.B. *("Ponce Federal"* o *"Banco")* mediante un recurso de apelación en el que solicita la revisión y revocación de una sentencia emitida el 20 de marzo de 1996 por el Tribunal de Primera Instancia, Sala Superior de San Juan (Hon. Antonio L. Corretjer Piquer, J.). Mediante ésta, dicho foro dispuso de una acción incoada por el apelante reclamando la devolución de $66,575.00. Luego de ponderar la comparecencia de las partes, así como el derecho aplicable, resolvemos que el tribunal inferior actuó correctamente, por lo que procede confirmar el dictamen recurrido.

Ramiro L. Colón Muñoz presidió el Ponce Federal desde 1979 hasta el 8 de agosto de 1990. Previo al inicio de sus labores, Colón Muñoz tenía una póliza de seguro de vida que desde 1954 pagaba su antiguo patrono, Cooperativa de Cafeteros de Puerto Rico, y cuyo pago continuó efectuando el Banco como parte de sus beneficios marginales. Debido a consideraciones contributivas, en 1984 la titularidad de dicha póliza se transfirió al Ponce Federal. No obstante, el Banco nada pagó por la misma ni figuró entre sus activos, ya que siempre estuvo claro que tan pronto concluyera la relación laboral Colón Muñoz recuperaría su titularidad.

El 8 de agosto de 1990, Colón Muñoz y la Junta de Directores del Ponce Federal suscribieron un acuerdo en virtud del cual aquél se retiraba de su cargo como presidente del Banco, pero continuaría desempeñándose como presidente de dicha Junta. Las partes acordaron que al momento de su retiro, Colón Muñoz recibiría una compensación de $615,500.00. Establecieron, además, que recibiría $14,137.00 por sus funciones como Presidente de la Junta de Directores. El Ponce Federal se comprometió a suplirle un automóvil y un teléfono celular, así como a pagar las cuotas del Club Deportivo, el Club Náutico y el Bankers Club. Asimismo, el Banco transfería a Colón Muñoz la titularidad de la póliza de seguro de vida antes mencionada, y se comprometía a pagar por adelantado las primas correspondientes a treinta meses, cantidad que ascendía a $66,575.00. Mediante resolución emitida en la misma fecha, la Junta de Directores aprobó transferir la titularidad de la póliza de seguro de vida a Colón Muñoz, así como realizar el pago por adelantado por las primas de los próximos treinta meses. Así las cosas y de acuerdo con la resolución antes mencionada, el 9 de agosto de 1990, el Ponce Federal expidió un cheque a favor de Chubb Life Insurance Company of America *("Chubb Life")* por el pago de las primas del seguro de vida antes mencionado. Véase Apéndice del Recurso, pág. 44.

De otra parte, el Office of Thrift Supervision *("OTS")* inició una investigación administrativa contra Colón Ramírez, el Ponce Federal y su Junta de Directores. El 23 de agosto de 1990, emitió una orden prohibiendo al Banco transferir cantidad alguna a Colón Muñoz. Ante tal situación, el 31 de agosto de 1991, el Banco solicitó a la compañía de seguros tanto el reembolso de las primas pagadas por adelantado como que no procediera con el

cambio de titularidad de la póliza. Jaime Colón, agente a cargo de la póliza, informó que para ello era necesario que la Junta de Directores emitiera una resolución revocatoria de la resolución emitida el 8 de agosto de 1990, así como un documento que acreditara el consentimiento de Colón Muñoz. Ninguno de los documentos se produjo.

Posteriormente, Colón Muñoz y la OTS llegaron a un acuerdo que puso fin a la referida investigación. A tenor con el mismo, Colón Muñoz venía obligado a devolver la compensación de $615,500.00 que recibió como parte de su acuerdo de retiro, así como los gastos de asesoría legal en que incurrió el Banco. Dichos gastos ascendían a $428,601.00. El pago de estas sumas debía colaterizarse. A cambio, la OTS acordó:

"... to restraint from seeking of additional enforcement orders and/or assessments against Ramiro Colón with respect of any matters (i) reported in the OTS Reports of Examination of the Bank to the examination commenced on April 18, 1989, and on February 31, 1990, or (ii) discovered by the OTS as a result of its investigative proceeding, commenced pursuant to Federal Home Loan Bank Board No. KAC-89-95, dated August 4, 1989."

Apéndice del Recurso, a la pág. 46. Finalmente, la orden emitida por la OTS dispuso que: "[t]he Retirement Agreement is hereby rescinded and of no further force and effect." Apendice del Recurso, a la pág. 53.

El 11 de junio de 1992, el Ponce Federal instó una acción contra Chubb Life, Colón Muñoz, Georgina Ortiz Dexter, la sociedad legal de bienes gananciales compuesta por ambos, y cualquier beneficiario desconocido de la póliza. En la misma alegó que Colón Muñoz tenía la obligación de devolver los $66,575.00 que el Banco pagó por concepto de primas de seguro de vida. Por una lado, arguyó que debido a que Colón Muñoz rescindió voluntariamente el acuerdo de retiro, éste venía obligado a devolver todas las prestaciones incluyendo los pagos a dicho seguro. Por otro lado, señaló que la obligación de Colón Muñoz con la aseguradora era personal, por lo que al haber sido satisfecha por el Banco con su consentimiento, éste tiene, a tenor con el artículo 1112 del Código Civil, 31 L.P.R.A, sec. 3162, un crédito en su contra por dicha cantidad. En cuanto a Chubb Life, sostuvo que era responsable por aquella parte de los $66,575.00 de las primas pagadas por adelantado que al momento de la solicitud de reembolso -31 de agosto de 1991- no habían sido devengadas.

El 14 de noviembre de 1994, Ponce Federal y Chubb Life sometieron a la consideración del tribunal una "Estipulación de transacción y solicitud de sentencia parcial". A tenor con la misma, las partes desistieron con perjuicio de cualquier reclamación que tuvieran o pudieran tener entre sí a consecuencia de los hechos alegados en la demanda. Además, la compañía aseguradora se allanó a lo que el tribunal dispusiera en cuanto a la titularidad de la póliza y las primas pagadas. En igual fecha, el Tribunal de Primera Instancia dictó una sentencia parcial impartiendo su aprobación a la transacción.

Luego de varios trámites procesales, el Tribunal a quo emitió la sentencia aquí impugnada. Al así dictaminar, el Tribunal concluyó que la transacción realizada entre Colón Muñoz y la OTS no tiene el efecto de rescindir la totalidad del acuerdo de retiro, por lo que aquél no viene obligado a devolver la totalidad de las prestaciones. Condenó a la parte demandante al pago de costas y de $5,000.00 en concepto de honorarios de abogado por temeridad. Indicó, además, que sobre la sentencia se pagaría el interés legal de 9.75% a tenor con la Regla 44.3 de Procedimiento Civil, 32 L.P.R.A. Ap. III. Oportunamente, el Banco solicitó determinaciones adicionales de derecho. Así, el 14 de octubre de 1997, el Tribunal emitió una resolución aclarando que el interés legal le aplicaba a la cantidad concedida por concepto de honorarios de abogado. Dicho dictamen fue archivado en autos y notificado a las partes el 16 de octubre de 1997.

Inconforme, acude ante nos el demandante, mediante la oportuna interposición del recurso que nos ocupa. En el mismo señala que incidió el Tribunal inferior al concluir que el demandado-apelado, Colón Muñoz, no tiene la

obligación legal de devolver la cantidad de $66,575.00. Con el beneficio de la comparecencia de ambas partes, procedemos a resolver.

## II

En el presente caso no existe contienda en cuanto a la facultad de OTS para, en situaciones que determine que una parte afiliada a una institución bancaria ha incurrido en prácticas indeseables de la banca *("unsafe and unsound bank practices")*, ordenar la rescisión de cualquier acuerdo o contrato entre la institución y dicha parte. Tampoco cuestionan que pudiera hacerlo como parte de una transacción para finalizar una investigación. La discrepancia surge en cuanto a la interpretación de la palabra *"rescinded"* utilizada en la orden emitida por la OTS. El apelante sostiene que la misma equivale a la figura civilista de la rescisión de los contratos. Por el contrario, Colón Muñoz sostiene que dicho término se refiere a la figura del *"rescission"* del Derecho angloamericano.

Como es sabido, *"[l]a palabra rescisión significa deshacer o dejar sin efecto."* J. Puig Brutau, *Compendio de Derecho Civil,* Barcelona, Bosh, Vol. II, 2da ed., 1994, pág. 259. La Doctrina Civilista ha señalado que rescisión es la ineficacia de un contrato que adviene como resultado de una acción de impugnación del mismo. L. Diez Picazo, *Fundamentos del Derecho Civil Patrimonial,* Madrid, Editorial Civitas, Vol. I, 5ta ed., 1996, pág. 507. El hecho de que un negocio jurídico sea rescindible no implica que exista una prohibición legal para realizarlo, ni que se encuentre afectado por un vicio que lo pueda invalidar, sino que, por el contrario, presume *"...contratos que aunque válidamente otorgados, producen a una de las partes o a un tercero un perjuicio que la ley considera especialmente injusto, y para el que no hay otro modo legal de obtener su reparación."* J. Vélez Torres, *Curso de Derecho Civil,* San Juan, Revista Jurídica de Universidad Interamericana de Puerto Rico, T. IV, Vol. II, 1990, a la pág 134. Por ello, la rescisión es un recurso extremo, cuyo fundamento es resolver una situación que se estima es injusta e imposible de resolver por otro medio legal. Así, la misma sólo es viable en los casos que autoriza y prevé la ley. Véase artículo 1243 del Código Civil, 31 L.P.R.A. sec. 3492.

De acuerdo con el Artículo 1247 del Código Civil, 31 L.P.R.A. sec. 3496, la rescisión de un contrato conlleva la devolución de las cosas que fueron objeto del mismo con sus frutos, así como del precio y sus intereses. Sobre este precepto fundamenta el Banco su solicitud de restitución de los fondos.

El demandante-apelante pasa por alto que tanto la orden emitida por la OTS como la transacción que da paso a la misma se efectuaron al amparo de una ley federal ajena a nuestro Código Civil tanto cultural como doctrinalmente.

A diferencia del Derecho Civil, en el Derecho contractual norteamericano es posible rescindir un contrato por acuerdo entre las partes. Tal situación, sin embargo, no implica la devolución o restitución de las prestaciones objeto del contrato, sus frutos o intereses. *Williston on Contracts*, Third Edition Section 1454A. Las partes tienen total discreción para determinar el efecto que la rescisión tendrá sobre el contrato. Así, el referido tratadista ha expresado:

*"Where at the time of the rescission of a bilateral contract it has been partly performed on one or both sides, the parties may agree simply to forgo further performance and let past matters stand where they are, or they may agree not only to forgo future performance but also to make restitution by returning payments already made or paying for other performance which has been rendered."*

*Id.*, sec. 1827, pág. 490.

Coincidimos con el demandado-apelado en que el término *"rescinded"* utilizado en la orden de la OTS se refiere al *"rescission"* del Derecho angloamericano. Sólo así es posible que las partes convinieran finalizar el

contrato o acuerdo de retiro. De igual forma, al considerar las circunstancias del caso a la luz de la normativa expuesta, resulta evidente que la cantidad pagada por concepto de primas de seguro está excluida de la 'rescisión' del acuerdo. Las partes, en el ejercicio de la libertad que le concede dicha figura jurídica, establecieron cuáles prestaciones del acuerdo de retiro quedaron sin efecto y cuáles no. Surge de la estipulación y de la orden emitida, que las partes anularon aquella parte referente a la compensación de $615,500.00. Acordaron, además, su devolución al Banco. Sin embargo, ni en la estipulación ni en la orden se mencionan la póliza, las primas, el auto, las cuotas de los *"clubes"* o la compensación que Colón Muñoz recibiría por sus funciones como presidente de la Junta. Esto es indicativo de que las partes interesaban que dichas prestaciones continuaran en vigor. Así pues, es necesario concluir que el Tribunal sentenciador actuó correctamente al declarar *"sin lugar"* la demanda incoada.

### III

Por los fundamentos antes expuestos, se confirma la sentencia emitida el 20 de marzo de 1996 por el Tribunal de Primera Instancia, Sala Superior de San Juan.

Lo acordó y manda el Tribunal y lo certifica la Secretaria General.

Aida Ileana Oquendo Graulau
Secretaria General